UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 3:06-CR-94 |
| | ) | (Jordan / Shirley) |
| | ) | |
| ULYSSES ROBINSON, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## REPORT AND RECOMMENDATION

All pre-trial motions in this case have been referred to the undersigned pursuant to 28 U.S.C.

§ 636(b) for disposition or report and recommendation regarding disposition by the district court as

may be appropriate.

### I: PROCEDURAL HISTORY

This matter comes before the Court upon defendant Ulysses Robinson's[1] Motion for

Suppression of Arrest of Defendant and Suppression of the Search Warrant [Doc. 15]. Assistant

United States Attorney W. Brownlow Marsh represented the government. James Greenlee

represented the defendant, Ulysees Robinson, who was also present. An evidentiary hearing was

conducted on January 23, 2007, on the merits of this motion along with its addendum entitled

Amended Motion for Suppression of Arrest of Defendant and Suppression of the Search Warrant

---

[1] The defendant testified at the hearing that the spelling of his first name is Ulysees, rather than Ulysses. The Court will adopt the accurate spelling of the defendant's name in any textual reference. However, the style of the case will remain the same as it reflects the indictment.

1

[Doc. 18]. At the conclusion of the hearing, the Court set deadlines for optional post-hearing briefs. Counsel for the defense timely filed a Memorandum Supporting Motion to Suppress Arrest of Defendant [Doc. 29]. Likewise, the government timely filed Government's Response to Defendant's Memorandum Supporting Motion to Suppress Arrest of Defendant [Doc. 32]. The final post-hearing brief having been received on February 7, 2007, the Court took this motion under advisement February 8, 2007.

## II. TESTIMONY AT THE HEARING

At the evidentiary hearing conducted on January 23, 2007, the government presented the testimony of three law enforcement agents and defendant Robinson testified.[2]

### A. David Joyner

The government's first witness was David Joyner, a detective with the Pigeon Forge Police Department assigned to the Fourth Judicial District Drug Task Force ("Joyner"). Joyner testified about his investigation and search of 1828 Norlil Road, Sevierville, Tennessee in fall 2004. Joyner testified to three undercover operations that formed the basis of his request for a search warrant.

Joyner testified that he was working undercover with a female confidential informant ("CI"). The CI arranged to purchase drugs from a man, Gill Rodney Thomas[3] ("Thomas"). Joyner testified that Thomas was unaware that Thomas was participating in a police investigation. On October 27, 2004, Joyner and the CI drove to the parking lot of a Kroger's supermarket in Sevier County and met Thomas. Joyner and the CI remained in their vehicle for the operation. Thomas approached the CI

---

[2] An official transcript of the hearing has been electronically filed with the Court as Document 30.

[3] The officers originally thought the man's name was Gill Howard.

on the passenger side and spoke to her through the window. Thomas told the CI, in Joyner's presence, that he would go to "somewhere off Allensville" and buy crack cocaine for her. Joyner handed the CI currency whose serial numbers had been previously recorded, which she in turn handed to Thomas. Thomas then left the parking lot in a car.

As part of the planned operation, Officer Kevin Bush ("Bush") was waiting in an unmarked police vehicle nearby. Bush followed Thomas from the parking lot straight to a house at 1828 Norlil Road, less than three miles away. There, Bush watched as Thomas went inside the house. After a short time, Bush observed Thomas return to his vehicle and drive directly back to the Kroger's parking lot and approach Joyner and the CI in their vehicle. Joyner testified that Thomas then handed crack cocaine to the CI.

Joyner described two additional operations, identical in nature, on November 4, 2004, and November 5, 2004, both resulting in the purchase of crack cocaine. Before the third operation on November 5, 2004, the officers drafted an application for a search warrant. Joyner testified that he telephoned Sevier County Circuit Judge Richard Vance to let him know the officers would be bringing an application for a search warrant if their third undercover operation was successful. At this point in the hearing, AUSA Marsh offered into evidence the search warrant in question, complete with the supporting affidavit, the inventory and return, and photographs attached to the original application.[4] Joyner testified that the third cocaine purchase was successful and the officers took their application for a search warrant to Judge Vance, who signed the search warrant.

Joyner then testified as to the execution of the search warrant. Joyner said that he and at least

---

[4] Collective Exhibit 2.

3

eight other officers, some of whose names he could not recall, executed the search warrant. The officers' plan was to "stack the front door," employ a distraction device, and then signal a breach entry. Joyner went to the rear of the house located at 1828 Norlil Road and set up a distraction. Various testimony described this as a piece of equipment (a "flash/bang") producing a loud, concussive sound accompanied by a bright flash of light. Evidently, this was intended to draw the attention of the occupants of the house away from the front door where most of the officers were amassed for entry. When Joyner regrouped with the other officers, two persons had been "secured," the defendant and his girlfriend, near a pick-up truck in the carport for the house.

Joyner testified that Officer Hinson advised the defendant of his Miranda rights, although he could not say whether the defendant indicated that he understood his rights. Joyner recalled that the female subject was taken into the kitchen and defendant Robinson was taken into the adjacent living room. When asked whether he engaged in conversation with defendant Robinson, Joyner testified "I had conversations with him on and off throughout the entire time we were there." (Tr. at 44).

Joyner next testified to the items found in the house. Joyner testified that scales consistent with the drug trade were found, but he did not know where. Joyner testified that currency was found in the front pocket of some blue jeans in a laundry basket located in the front bedroom. On direct examination by AUSA Marsh, Joyner testified:

> Q. And how did you know to look there?
> A. I was told where it was at.
> Q. By who?
> A. The defendant.
> Q. Did you ask him?
> A. Yes.
> Q. And he told you?
> A. Yes.

(Tr. at 45).

4

Joyner then testified that a loaded weapon was found in the same room as the money, in a shoe box at the top of a closet. Again, Joyner testified that the defendant stated the weapon and money were his. Joyner intimated this was in part out of Robinson's concern for his female companion and his concern about her going to jail. Robinson also accepted responsibility for the drugs, according to Joyner's testimony. (Tr. at 46 - 47).

On cross-examination, Joyner testified that the three purchases to which he testified on direct examination each resulted in purchases of cocaine; when asked what type, he said crack cocaine. However, Joyner's affidavit refers to cocaine, and references a white powder substance. Joyner also testified that Robinson identified himself as the person in possession of the home and thus was listed as the homeowner. Joyner also testified the cocaine was seized by either Agent Bush or Lieutenant Hinson. It was also pointed out that a handwritten receipt by Joyner said the officers had seized 11.8 grams of hard (crack) cocaine and 3 grams of soft (powder) cocaine. Defense counsel presented Joyner with the Tennessee Bureau of Investigation Official Forensic Chemistry Report (Exh. 4). Joyner admitted that this report said the forensic test laboratory tested both exhibit 01-a and 01-b as a rock-like substance and testified that no powder substance was listed on the report.[5] Joyner also testified that Thomas was not searched before he went on any of the three "buys," because of the nature of the undercover operation. Such a search would have exposed the operation. Joyner conceded it was possible that Thomas had cocaine on his person when he was given the money and just went inside 1828 Norlil Road, said "hello," and gave the occupant(s) money owed by Thomas without actually purchasing cocaine. (Tr. at 59 – 60). Joyner testified that Thomas was criminally

---

5 However, the Court notes the forensic testing results showed item 01-a as cocaine base 10.3 grams and 01-b as

charged with the three drug sales to the CI and "is doing 12 years."

Continuing on cross-examination, Joyner testified that while Robinson admitted the gun and drugs belonged to him, he denied ownership of the scales. Joyner conceded that this confession was not noted in his narrative. (Exh. 3). Joyner testified that he could not see Robinson being searched in the carport. (Tr. at 57). Joyner could not say whether Robinson was searched before or after the search warrant was executed. (Tr. at 57). Joyner also testified he did not know who Ulysees Robinson was before the officers executed the search warrant. (Tr. at 58).

Joyner testified that no promise was made that Robinson's female companion would not be arrested if Robinson took responsibility for the gun and drugs, but she was, in fact, not arrested. (Tr. at 64). Joyner testified the reason the female was not arrested was because Robinson admitted the drugs and gun were his. Joyner testified that the defendant was compliant and cooperative during the search, but the officers did not ask Robinson to sign a written Miranda waiver because he would not sign the seizure paperwork. Joyner expressed his impression that because Robinson would not sign these other papers, it seemed futile to present him with a Miranda rights waiver form, although he had previously verbally waived the rights. As to the Miranda rights waiver form used by police, Joyner testified, "at some point we implemented a form, this may've been before or maybe we didn't have one." (Tr. at 63). However, the property seizure and forfeiture form were prepared by Bush, Joyner signed them, but Robinson refused. (Exh. 6).

Joyner testified that he had completed a report to memorialize the search. In the report form there was a prompt, "Admonishment of rights form signed?" with a box for either a "yes" or "no" answer. In his report, Joyner marked the "no" box, but Joyner explained that the Miranda rights were

cocaine 3.6 grams.

6

given orally. (Tr. at 56 - 57). At the prompt for "statement given" he also checked "no" but stated that he meant that a written statement was not given, although he conceded the form did not make that distinction.

## B. Kevin Bush

Officer Kevin Bush testified consistently with Joyner about the investigation that led to the search warrant. Bush testified that he did not have any specific information about Robinson before executing the search warrant. Bush testified that Joyner led the operation as he was head of the Drug Task Force. Bush was a member of the Drug Task Force at the time of these events. Bush was also a member of the Sevier County Sheriff's swat team. Bush testified that it was Joyner's decision whether to include the swat team on any operations of the Drug Task Force. Joyner asked Bush to request assistance of the swat team; Bush made the request through proper channels at the Sheriff's Office and it was approved. Bush testified that this was routine: "On any search warrant we just don't have the manpower and we ask to use elements of our swat team."

Bush testified that he was with the group of officers approaching the house when they encountered Robinson in the carport area heading toward a vehicle. (Tr. at 78). Bush testified that he identified himself as police and gave a verbal command to Robinson to get on the ground, and the defendant complied. Bush later handcuffed Robinson and asked him whether he had any weapons on him (Tr. at 86, 89) and that Robinson volunteered that he had cocaine in his front pocket. (Tr. at 80 - 81). Bush testified that he then asked for consent to search the pocket and retrieved the cocaine. (Tr. at 81). Detective Bush also testified that he was present when Miranda rights were read and were explained to the defendant by Lieutenant Hinson. (Tr. at 81). Bush could not recall if they had a written Miranda waiver form in use at that time. He also testified that he was present when the

7

defendant was questioned by Joyner. He recalled the scales being found in the search, but he could not recall where they were found as it had been two to three years ago. He described the cocaine as being in baggies with the corners cut off. Bush also testified they were looking for marked money and when the officers found the money a lot of it matched the serial numbers of the "buy money." He believed the defendant told Joyner where the money was located. Bush testified the money and the gun were found in the same room, the gun being in a shoe box in the closet. He could not recall if the gun was moved, but noted that it probably was moved for safety reasons, to be sure it was unloaded. Bush testified that Robinson "was generally concerned, that he wanted to claim everything and did not want her to go to jail," referring to Ms Thomas. (Tr. at 86).

On cross-examination, Bush testified that the team of officers executing the search warrant included swat team members because, "Numbers, danger factor. I mean, you are dealing with drug dealers, unpredictable." (Tr. at 87). He later testified the defendant's girlfriend, Christina, was also on the ground, handcuffed for safety reasons. (Tr. at 97). He confirmed that he asked the defendant if he had any gun, knives, sharp objects or needles (Tr. at 89), or explosives (Tr. at 90), and that Robinson voluntarily said he had cocaine in his pocket (Tr. at 92). This occurred before any Miranda rights were given (Tr. at 91) as he was too busy with regard to safety at that point (Tr. at 91). Defendant's attorney asked Bush if the defendant was considered a suspect and Bush answered that he considered the defendant at the scene of a narcotics search warrant and he wasn't going anywhere. (Tr. at 91). He was also asked if the defendant was under arrest at this point and Bush testified that Robinson was simply being detained, though he was not free to leave. (Tr. at 90). He was also asked again about knowing the defendant, and he stated they had heard about his criminal past from the informant and heard he was a "substantial player." (Tr. at 92).

Detective Bush testified the multiple containers he took from Robinson's pocket appeared to be cocaine. He could not recall if they were in a pill bottle due to the length of time since the events, but reiterated they were in baggie corners. Bush did not know what kind of cocaine it was (Tr. at 95) primarily due to the lighting (Tr. at 99). Defense counsel asked Bush whether he had testified at a state court proceeding that officers handcuffed Robinson immediately because of his prior record. Bush responded that he could not remember, as "that was two or three years ago" and he would have to listen to the tape. (Tr. at 87). After listening to the tape of the proceedings, Bush confirmed it was his own voice and when asked again why the swat team was present, he said this was for officer safety, safe operation and due to the violent criminal history of the defendant. (Tr. at 89). Bush testified that he found multiple small containers of cocaine in Robinson's pocket. Bush could not testify whether he found powder cocaine or crack cocaine. (Tr. at 95, 98, 99).[6]

## C. Robert Hinson

Lieutenant Robert Hinson ("Hinson") of the Sevierville Police Department testified that he provided tactical support in the execution of the search warrant at 1828 Norlil Road. Hinson testified that his responsibilities were limited to the initial entry into the house and clearing the house of people

---

6 Before receiving the testimony of these witnesses, the Court received into evidence a cassette tape recording of a preliminary hearing conducted in the General Sessions Court for Sevier County, Tennessee, based on the testimony of Doris Miles, who works in the General Sessions Court clerk's office and is keeper of the tapes. (Tr. at 4). This cassette tape was not played during the hearing, although a portion of it was reportedly used to refresh Bush's recollection off the record during a recess of the Court. The entire tape having been moved into evidence without objection (Tr. at 10), the Court has reviewed this exhibit, along with all others, during the time this case has been under consideration. The tape contains, chiefly, the prior testimony of Officer Kevin Bush in state proceedings. Bush's prior testimony is not inconsistent with his testimony offered to this Court regarding the information the officer had on the defendant at the time of the search warrant. At the suppression hearing, he testified that he couldn't remember, as it had been two or three years, and would have to listen to the tape. (Tr. at 87). After listening, the Court concludes he testified consistently with the taped testimony. The Court also notes that his prior testimony was consistent with his testimony in this court regarding the defendant's spontaneous and voluntary statement that he had cocaine in his pocket, as well as the defendant's admissions that the drugs, the gun and everything found in the house were his.

and dangers. Hinson testified that he was not a part of the Drug Task Force, but was on the scene in his capacity as a swat team member. (Tr. at 100). Hinson did not have any information about Robinson or the narcotics investigation. Hinson testified that he walked to the carport where other officers were standing Robinson on his feet. Hinson testified that he then advised Robinson of his Miranda rights from memory (as he knows them from memory, doing this often, if not daily). (Tr. at 101 - 102). Hinson described what he told Robinson about his Miranda rights:

> Advised him that he had the right to remain silent, anything he said could be used against him in court. He had the right to counsel. He had the right to have counsel present before any questioning. That these fellas wanted to speak with him about the events that had taken place that night, and, you know, he didn't have to speak with them, if he didn't want to, without counsel present.

(Tr. at 101). The defendant stated to Lt. Hinson that he understood his rights, and that he was agreeable to speaking with Agent Joyner. (Tr. at 102). Lt. Hinson confirmed the Miranda rights were given to Robinson on the carport, while he was standing and before any search took place. (Tr. at 104). Lt. Hinson testified that after his explanation of Miranda, "[w]e walked him back in and sat him down on the table." (Tr. at 104).

Hinson testified on cross-examination that his primary duty assignment is with the major crimes investigation unit. Hinson testified that he was one of the first officers in the house, his duty was to secure the house and make sure any threats were nullified, that he confronted an angry dog as he entered, and he and others then secured the house. (Tr. at 103). Hinson did not participate in searching the house or questioning Robinson or the female detainee, but rather, left the scene shortly thereafter. (Tr. at 104). Hinson confirmed that he did not have a Miranda rights waiver form with him.

10

## D.  Ulysees Robinson

Ulysees Robinson ("Robinson") was the last witness heard by the Court and was called by the defense.  The Court advised Robinson of his right not to testify and of Robinson's right to remain silent through all proceedings.  Robinson said that he understood these rights, that he and his attorney had discussed them and that he wished to testify.  (Tr. at 106).  Defense counsel confirmed that he had explained to Robinson the problems associated with testifying and his right to remain silent and that he felt it was in Robinson's best interest to testify at this hearing.  (Tr. at 107).

Robinson testified that he and his girlfriend, Christina Thomas, were leaving her house to go to a store when he heard running footsteps.  Robinson testified the police ran up to him, ordering him to the ground.  Robinson testified that he complied and got on the ground.  (Tr. at 109).  He testified that it was not Bush, but another officer who detained and handcuffed him (Tr. at 109), and that Bush was with Christina Thomas instead.  (Tr. at 110).  Robinson testified that both of them were handcuffed and he was searched.  Robinson testified as follows:

> After they put both of us in handcuffs, they immediately just started shaking me down.  At that point nothing was said.  It was still a, you know, a hard, you know, all this was aggressive in nature.  None of this was, you know, can I do this or can I do that.  You know everything was aggressive at that point. Nobody asked can I search you or any of this.  At that point none of that had taken place yet.

(Tr. at 110).  Robinson testified that an officer, not Bush, took a pill bottle from his pocket with about 10 individual pieces of crack cocaine inside.  Robinson testified that he didn't think there was any powder cocaine.  (Tr. at 112 - 113).

Robinson testified that officer Joyner became "flustered" when they could not find money they were searching for in the house.  (Tr. at 110).  He state the officers took Ms Thomas into the house

first, for about 30 minutes before Robinson was taken inside Robinson and Ms Thomas were within sight of one another. Although Joyner testified Robinson told him where to find the money (Tr. at 45), the defendant said it was Ms Thomas. Robinson testified:

> Christina was sitting there and she is always emotional or whatever. I said to Agent Joyner, if she tells you where the money is at, is she going to jail? There was a tall officer that was standing behind him. He said, "No." He pointed at him. I said, "What is he going to do? Who is he?" He was basically saying, he is witnessing that I am saying this to you. I said, "Who is he?" When he said that, I said, "Tell him." She told him. He went in there, he got the money, he came back out.

(Tr. at 111).

When asked about <u>Miranda</u> warnings, Robinson said he was never advised of them, "Never. Never even came up." (Tr. at 109, 111). Robinson denied he told any policeman he possessed drugs in his pants pocket. (Tr. at 109). Robinson denied he claimed responsibility for what was found in the house. (Tr. at 112).

As to the gun, Robinson testified that when the officer first took him inside the house, Joyner walked up to Robinson "with a gun on a pencil." Joyner asked Robinson whether he was a convicted felon; Robinson answered in the affirmative. Joyner asked if the gun was Robinson's. Robinson testified that he told Joyner the gun was not his. Joyner said they would fingerprint the gun, but Robinson just said, "Fine," and did not claim ownership. (Tr. at 111).

On cross examination, Robinson testified that when he gave his address to the officers he gave them the address 1828 Norlil Road. It was not the address on his driver license at the time of this search, but he later used 1828 Norlil Road as his driver license address. On direct and cross examinations, the defendant admitted that prior to this incident, Sevier County police had been called out to a "verbal spat" between he and Christina Thomas. Robinson testified that after that incident he

had gone to Atlanta, but returned about three weeks later at her request. (Tr. at 108, 115).

As will be noted herein as to specific issues and testimony, the Court finds the testimony of the officers credible and the testimony of the defendant, in direct opposition thereto, not credible.

## II.  ISSUES PRESENTED FOR REVIEW

Defendant Robinson has moved to suppress any and all evidence found during the search [Doc. 15], [Doc. 18] and [Doc. 29], arguing that the search warrant lacked probable cause, was therefore invalid and, further, that it was improperly executed.  Robinson has also, by the same pre-trial motions, moved to suppress all statements allegedly made by him on the grounds that the statements were involuntary and were obtained in violation of the strictures of Miranda v. Arizona, 384 U.S. 486 (1966).  Because the facts and circumstances surrounding the alleged incriminating statements are also applicable to the physical searches, where possible the Court will address the issues in the order in which they arose chronologically as events unfolded.

### A: Validity of the Search Warrant

The officers came to 1828 Norlil Road to execute a search warrant; Robinson challenges the validity of that search warrant.  As a threshold issue, the Court will address the authority of that search warrant for actions taken by the officers. While a search warrant must be strictly construed, the burden of establishing that the search was improper and that the evidence secured thereby should be suppressed is on the moving party. United States v. Thompson, 409 F.2d 113, 116-117 (1969); United States v. Bennett, 170 F.3d 632, 635-36 (6th Cir. 1999).

### 1.  Whether State Law or Federal Law Governs This Search Warrant

Because in this case state law enforcement agents obtained a state search warrant from a state

13

judge, the Court will first address the issue of whether state or federal law applies to the instant analysis. The government claims the Court should look to state law; the defense says the Court must apply federal law. There appears the have been no federal involvement in the case until later prosecution. However, the Sixth Circuit has addressed the question of "whether a federal court must look to state law to assess the validity of an arrest, search, and seizure for purposes of determining the admissibility of the seized evidence in a federal criminal trial." United States v. Wright, 16 F.3d 1429, 1433 (6th Cir. 1994), cert. denied, 512 U.S. 1243 (1994); see also, United States v. Shields, 978 F.2d 943, 946 (6th 1992). The court observed that the exclusionary rule, which requires the suppression of evidence gained in violation of the Fourth Amendment, is a judicial response to a violation of the defendant's constitutional rights. Id. It held that evidence must be suppressed pursuant to the exclusionary rule only if it violates the Fourth Amendment, not state law:

> [I]n federal court, [the exclusionary] rule only requires the court to exclude evidence seized in violation of the Federal Constitution. A state may impose a rule for searches and seizures that is more restrictive than the Fourth Amendment; that is, the state may exclude evidence in state trials that would not be excluded by application of the Fourth Amendment alone. However, the state rule does not have to be applied in federal court.
> Id.

The exclusionary rule only requires the exclusion of evidence seized in violation of the Federal Constitution. Wright, 16 F.3d at 1434. "The fact that Tennessee law may . . . require greater protection against searches and seizures than the fourteenth amendment is of no avail to a defendant in federal court, under prosecution for a federal crime." Id. (quoting United States v. Loggins, 777 F.2d 336, 338 (6th Cir. 1985)). This Court will apply neither procedural nor substantive state law; this search warrant in governed by application of the federal Constitution only.

14

## 2. **Standard For This Search Warrant**

The Fourth Amendment states that "no Warrants shall issue but upon probable cause, supported by Oath or affirmation . . . ." U.S. Const. amend. IV. Probable cause to search is "a fair probability that contraband or evidence of a crime will be found in a particular place." Illinois v. Gates, 462 U.S. 213, 238 (1983). To make such a showing "requires only a probability or substantial chance of criminal activity, not an actual showing of such activity." Id. at 244 n.13. Thus, the Supreme Court has observed that:

> probable cause is a flexible, common-sense standard. It merely requires that the facts available to the officer would "warrant a man of reasonable caution in the belief," Carroll v. United States, 267 U.S. 132, 162 (1925), that certain items may be contraband or stolen property or useful as evidence of a crime; it does not demand any showing that such a belief be correct or more likely true than false. A "practical, nontechnical" probability that incriminating evidence is involved is all that is required. Brinegar v. United States, 338 U.S. 160, 176 (1949).

Texas v. Brown, 460 U.S. 730, 742 (1983): accord, Gates, 462 U.S. at 230; United States v. Padro, 52 F.3d 120, 123 (6th Cir.1995); United States v. Sims, 975 F.2d 1225, 1238 (6th Cir.1992), cert. denied, 507 U.S. 932 (1993); United States v. Nigro, 727 F.2d 100, 103 (6th Cir.1984).

In other words, probable cause is "reasonable grounds for belief supported by less than prima facie proof but more than mere suspicion." United States v. Bennett, 905 F.2d 931, 934 (6th Cir. 1990). Whether probable cause to issue a search warrant exists is evaluated by looking at the totality of the circumstances. Gates, 462 U.S. at 238.

Initially, the Court would note that the issuing judge's determination that probable cause exists is entitled to "great deference." United States v. Allen, 211 F.3d 970, 973 (6th Cir. 2000), cert.

denied, 531 U.S. 907 (2000) (quoting Gates, 462 U.S. at 236). This deferential standard promotes the preference for the use of search warrants as opposed to warrantless searches. Id. In reviewing the propriety of the search warrant, "[t]he task of the reviewing court is not to conduct a de novo determination of probable cause, but only to determine whether there is substantial evidence in the record supporting the [judge's] decision to issue the warrant." Massachusetts v. Upton, 466 U.S. 727, 728 (1984). This Court considers "the evidence that the issuing [judge] had before him only to ensure that he had a substantial basis . . . for concluding that probable cause existed." United States v. Jones, 159 F.3d 969, 973 (6th Cir. 1998) (quoting Gates, 426 U.S. at 238-39).

In determining the sufficiency of the search warrant affidavit, the Court is "concerned only with the statements of fact contained in the affidavit." United States v. Hatcher, 473 F.2d 321, 323 (6th Cir. 1973); accord United States v. Frazier, 423 F.3d 526, 531 (6th Cir. 2005) ("our review of the sufficiency of the evidence supporting probable cause is limited to the information presented in the four corners of the affidavit").

### 3. The Four Corners of the Affidavit

The affidavit submitted by Joyner in support of the search warrant application in this case states:

> 1. I am a Special Agent with the State of Tennessee Fourth judicial district Drug and Violent Crime Task Force. I have been employed by the Pigeon Forge Police Department for approximately 6 years, the past 2.5 years of which I have been assigned to the Drug Task Force. Prior to that the Texas Department of Public Safety employed me as A State Trooper for 5 years. During the past 11 years as an officer and Drug Task Force Agent I have been involved with or participated in approximately 300 narcotic investigations. I have worked in an undercover capacity to purchase narcotics and gain intelligence. I have executed search warrants, conducted surveillance of

16

drug transactions, seized evidence, arrested suspects, interviewed suspects and conferred with Local, State, and Federal Prosecutors and other Law Enforcement Officials in my community regarding narcotic investigations, and as a result, gained considerable experience.

2. On October 27, 2004 while in an undercover capacity, I purchased cocaine from an individual. During that undercover drug transaction after the individual was given money by me, Drug Task Force Agents followed the person to 1828 Norlil Road Sevierville, Tennessee. The individual then brought back what was believed to be Cocaine from the residence.

3. On November 04, 2004 while in an undercover capacity, I purchased cocaine from the same individual. During that undercover transaction after the target was given money by me, Drug task Force Agents followed the person to 1828 Norlil Road, Sevierville, Tennessee. The individual then brought back what was believed to be cocaine from the residence.

4. On November 05, 2004 a third undercover drug transaction was conducted from the same individual. The individual was followed to 1828 Norlil Road Sevierville, Tennessee. The individual then brought back what was believed to be cocaine from the residence.

5. The white powder substance in the above three occasions field tested positive for cocaine.

6. Based on above intelligence, surveillance, experience and training, Affiant David L. Joyner believes that illegal narcotics and drug proceeds are in the residence of 1828 Norlil road Sevierville, Tennessee. The residence to be searched has a physical address of:

1828 Norlil Road Sevierville, Tennessee.

7. I request to search the above mentioned residence, including outbuildings, and vehicles for: narcotics, packaging materials used to package and preserve narcotics, weighing devices used to weigh and distribute narcotics, receipts, records and other documentation which reflect narcotic sales, weapons, which are

17

> used as protection devices in the illegal drug trade, illegal drug proceeds and surveillance equipment. All of these items constitute contraband; property used, or intended to be used in commission of drug offense in violation of the laws of the State of Tennessee.

Defendant Robinson argues that the affidavit did not supply sufficient probable cause to support the issuance of a search warrant for 1828 Norlil Road. Defendant argues that the nature of the investigation, "uncontrolled buys,"[7] presents so many evidentiary shortcomings that it cannot provide the basis for issuance of a search warrant. Defendant Robinson presented a number of alternative scenarios to the sale of cocaine from 1828 Norlil Road. While the Court agrees that "controlled buys," would provide a superior basis for a probable cause finding, the issuing Tennessee state Circuit Court Judge Vance had only the three uncontrolled buys from which to draw his conclusion. "The probable cause requirement . . . is satisfied if the facts and circumstances are such that a reasonably prudent person would be warranted in believing that an offense had been committed and that evidence thereof would be found on the premises to be searched." United States v. Besase, 521 F.2d 1306, 1307 (6th Cir. 1975). "Probable cause exists when there is a fair probability, given the totality of the circumstances, that contraband or evidence of a crime will be found in a particular place." United States v. Johnson, 351 F.3d 254, 258 (6th Cir. 2003) (quoting United States v. Greene, 250 F.3d 471, 479 (6th Cir. 2001).

---

7 The Sixth Circuit has described a transaction in which a confidential informant gave pre-recorded "buy money to an unidentified female, who was then followed to the address in question, observed entering and leaving, and who later delivered a baggie of crack cocaine to the confidential informant," as a "modified controlled buy." U.S. v. Hython, 443 F.3d 480, 486 (6th Cir. 2006). As in the instant case, the affidavit in Hython, did not establish the reliability of either the confidential informant or the female supplier, nor did it assert that they were patted down to make sure that they were not carrying drugs at the time of the controlled buy, in an effort to eliminate them as the potential source for the drugs. Hython, 443 F.3d at 486 n.1. The degree of control in the "controlled buy" was itself not fatal to the affidavit in Hython, although the search warrant was found to be lacking for other reasons (e.g., solitary transaction, no date indicated for the transaction, no evidence of recent activity, staleness) not applicable to this case.

In the case at hand, both the affidavit and the uncontroverted testimony at the hearing established that Joyner and the CI brought money to an apparently unsuspecting Thomas and asked him to obtain cocaine for them. Bush then followed Thomas from Joyner and the CI to 1828 Norlil Road, never losing sight of him. Thomas went inside the address for a short time, then returned to his car and traveled directly back to Joyner and the CI where he handed over the requested cocaine. This scenario happened the same way three times in less than 10 days, including the day of the search warrant request. These facts were presented to the state Circuit Court Judge in the form of an affidavit and application for a search warrant. The Court finds that it was a reasonable, common sense deduction that Thomas went to the house at 1828 Norlil Road and exchanged the buy money for cocaine and returned with the cocaine and delivered it to Joyner and the CI. As such, and given the repeated, ongoing and continuous nature of this apparent criminal enterprise, from October 27, 2004 through November 5, 2004, there existed more that a "fair probability" that cocaine, contraband, the marked money, property designed for use or intended for use or used in committing a crime (e.g., weapons), or other evidence of criminal activity would likely be found inside 1828 Norlil Road.

The Court concludes that this affidavit supplied sufficient facts to constitute a substantial basis for concluding there was, "a probability or substantial chance of criminal activity, not an actual showing of such activity" at this residence. Illinois v. Gates, 462 U.S. 213, 244 n.13 (1983).

In a closely related argument, defendant Robinson challenges the sufficiency of the nexus between any criminal activity and 1828 Norlil Road, to support a search warrant; much argument was devoted to the person of the defendant. A search warrant affidavit must identify the place to be searched, the objects or type of evidence sought, and a nexus between the two that is, it must state

19

why the affiant believes the evidence will likely be found in that place. United States v. Hython, 443

F.3d 480, 485 (6th Cir. 2006) (citing United States v. Van Shutters, 163 F.3d 331, 336 (6th Cir.1998),

cert. denied, 526 U.S. 1077 (1999)). For the reasons the Court finds that the issuing judge had

adequate information before him that provided a substantial basis for concluding that adequate

probable cause existed for the issuance of the search warrant for this residence The Court likewise

finds there was sufficient nexus between the criminal activity described in the affidavit and the location

to be searched. Each time money was given to Thomas, he traveled to the same location (1828 Norlil

Road) that was the subject of the search warrant and each time returned with cocaine. In fact, due to

the nature of this continuing operation, the connection between the sale of cocaine and the location to

be searched was the gravamen of the affidavit; there was no information about an individual to be

found at the location. The whole operation centered on the specific address, and as such, this Court

finds there was sufficient nexus between the undercover purchases of cocaine and the house at 1828

Norlil Road. Accordingly, the Court finds the search warrant was supported by sufficient probable

cause and a sufficient nexus to the place to be searched.

## B. Admissibility of Statement Made in Carport and Cocaine Found on

## Defendant's Person

At the evidentiary hearing, all witnesses agreed that the officers encountered Ulysees Robinson

on the property as police approached the house at 1828 Norlil Road to execute a search warrant.

Likewise, all witnesses at the hearing agree that Robinson was detained immediately; he was not free

to leave. During this time, the officers obtained cocaine from one of Robinson's pockets. The facts

surrounding that acquisition and any incriminating statements made in conjunction are in dispute.

Although he denies making the incriminating statements at issue (i.e., that he had cocaine in his

20

pocket), defendant Robinson also asserts to the Court that he denies being given <u>Miranda</u> warnings at any time and denies he claimed the gun and drugs were his. All this is contrary to the testimony of the three officers. It is Robinson's position, as set forth unequivocally at the evidentiary hearing, that he was in custody at the time he was ordered to lie on the ground and handcuffed. Applying an orderly methodology to the myriad issues arising from these facts, the Court must first ascertain the nature of Robinson's detention at the time statements are alleged to have been made in order to determine their admissibility. The Court next must make a finding of fact as to whether Robinson made the statement allowing a search of his pocket, and, if given, whether it was given voluntarily or spontaneously.

The <u>Miranda</u> court itself defined custodial interrogation as "questioning initiated by law enforcement officers after a person has been taking into custody or otherwise deprived of his freedom of action in any significant way." <u>Miranda</u>, 384 U.S. at 444. The Sixth Circuit has held that the "initial determination of custody depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned. Thus, the only relevant inquiry is how a reasonable man in the suspect's position would have understood his situation." <u>United States v. Protsman</u>, 74 Fed. Appx. 529, 533 (6th Cir. 2003) (quoting <u>Stansbury v. California</u>, 511 U.S. 318, 323-24 (1994)). The Sixth Circuit also noted that it employs a "totality of circumstances" approach to determine if a suspect is in custody and that resolution of that question is not based on a single factor but on all the circumstances. <u>Id</u>. For the reasons stated hereinafter, the Court deems the initial detention of the defendant was not a custodial arrest and hence <u>Miranda</u> would not apply.

Occupants of a searched premises may be detained during the execution of a search warrant for contraband, but they may not be searched or arrested in the absence of additional information

21

establishing probable cause. "A warrant to search for contraband founded on probable cause implicitly carries with it the limited authority to detain the occupants of the premises while a proper search is conducted." Michigan v. Summers, 452 U.S. 692, 705 (1981).

In Summers, decided 15 years after Miranda, the Supreme Court held that law enforcement officers are granted limited authority to detain occupants[8] of a home during a lawfully executed search warrant for the amount of time necessary to complete the search. Summers, 452 U.S. at 705. It is permissible for police to question suspects while temporarily seized during execution of a proper search warrant without administering Miranda warnings, subject to certain limitations. Such questioning must be limited to seeking identification, verifying or dispelling suspicions of criminal conduct, or maintaining the status quo while obtaining more information. E.g., Berkemer v. McCarty, 468 U.S. 420 at 439-40 (1984); Adams v. Williams, 407 U.S. 143, 146 (1972). In Summers, the court found it appropriate for police to stop the defendant as he was "descending the front steps." Summers, 452 U.S. at 693. The Sixth Circuit has held that the detention of a defendant approaching the residence by going up the driveway is proper. United States v. Bohanan, 225 F.3d 615, 617-18 (6th Cir. 2000). The Court finds that Robinson's sudden exit from the house and appearance on the driveway made initial detention by the police a reasonable Summers detention.

Although Robinson was not free to leave during this Summers detention, such detention and investigation did not rise to the level of a formal arrest, and thus he was not entitled to be advised of Miranda rights, furthermore, the mere fact of handcuffing the defendant during a Summers detention does not raise the detention to a formal arrest. Muehler v. Mena, 544 U.S. 93 (2005). It further

8 "Occupants" are not limited to active residents. U.S. v. Fountain, 2 F.3d 653, 663 (6th Cir.), cert. denied 510 U.S. 1014 (1993).

appears that the Summers detention later escalated into a custodial arrest sometime after the defendant was found to be in possession of crack cocaine and after he was taken inside the house. Until that time, however, the Court finds that the restraint exercised did not reach the level associated with a formal arrest or coercive context to amount to custody. Accordingly, prior to that time Miranda rights were not required for questions limited to seeking identification, verifying or dispelling suspicions of criminal conduct, or maintaining the status quo while obtaining more information.

The Court must next determine whether the incriminating statement, "I have cocaine in my pocket," was spontaneously made and/or voluntarily made by Robinson of his own accord in response to limited questioning authorized by Summers.

Bush testified that he only asked Robinson whether he had any weapons, knives, sharp objects, needles or explosives on his person, at which time Robinson volunteered that he had cocaine in his pocket. Volunteered statements of any kind are not barred by the Fifth Amendment. Rhode Island v. Innis, 446 U.S. 291, 300 (1980). Robinson, on the other hand, testified that Bush asked him nothing, but a different officer who detained Robinson searched his pockets after he was on the ground and handcuffed.

The Court finds that the testimony of the officers is more credible than the testimony of the defendant. In particular, defendant Robinson's credibility problems begin with his being a thrice convicted felon, (Tr. at 137), and continue with his possession of illegal narcotics, a loaded weapon in the house where he was staying, and marked money from the drug transactions. None of this is in dispute. Thus, his denials of virtually all his statements and the attempt to impugn the actions of all the officers must be viewed through this prism. The officers' testimony was not impeached, other than by the defendant's statements, and the Court finds their testimony to be credible. Officer Bush's

testimony in Court was substantially the same as his prior testimony on these issues, as well. Thus, on this issue the Court finds the testimony of Officer Bush was more credible than the defendant's testimony, and the defendant's statement that he had cocaine in his pocket was made voluntarily and spontaneously.

## C. Search Inside the House

In addition to cocaine, the search warrant authorized a search for marked currency, packaging materials, weighing devices, receipts records and documentation of narcotic sales, "weapons, which are used as protection devices in the illegal drug trade," drug proceeds and surveillance equipment.

Robinson moves to suppress the introduction into evidence of the gun seized in this search.

The Court is cognizant that "finely-tuned standards such as proof beyond a reasonable doubt or by a preponderance of the evidence, useful in formal trials, have no place in the judge's decision. While an effort to fix some general, numerically precise degree of certainty corresponding to probable cause may not be helpful, it is clear that only the probability, and not a prima facie showing, of criminal activity is the standard of probable cause." Illinois v. Gates, 462 U.S. 213, 235 (1983) (citation omitted). The affidavit here did present facts to the issuing judge from which he could reasonably conclude that weapons might be located at 1828 Norlil Road. The degree of specificity required in a search warrant depends on the type of items to be seized and the crime involved. A warrant must only be "as specific as the circumstances and the nature of the activity under investigation permit." United States v. Henson, 848 F.2d 1374, 1383 (6th Cir. 1988). The police used an indirect method to accomplish undercover drug purchases from the house by employing Thomas as an unwitting operative. While the officers gained information that 1828 Norlil Road was a likely source of cocaine, if they gathered any specific information about guns or the occupants this was not presented to the

24

judge. However, the affidavit begins with a recitation of the officer's considerable experience with narcotics investigations, and concludes with his statement that, "...weapons, which are used as protection devices in the illegal drug trade...."

The Sixth Circuit identifies firearms as "tools of the drug trade" in narcotics trafficking, recognizing that "dealers in narcotics are well known to be dangerous criminals usually carrying weapons." United States v. Korman, 614 F.2d 541, 546 (6th Cir.1980); accord United States v. Marino, 658 F.2d 1120 (6th Cir.1981); United States v. Arnott, 704 F.2d 322, 326 (6th Cir.1983). Further, the Sixth Circuit has quoted with approval the words of the Second Circuit, "[e]xperience on the trial and appellate benches has taught that substantial dealers in narcotics keep firearms on their premises as tools of the trade almost to the same extent as they keep scales, glassine bags, cutting equipment and other narcotics equipment." United States v. Goliday, 145 Fed. Appx. 502, 504, (6th Cir. 2005) (quoting United States v. Wiener, 534 F.2d 15, 18 (2d Cir.1976). The possession of a gun in this case amounts to criminal activity if possessed by a convicted felon or used during the commission of a drug offense. There was no information before the issuing judge to conclude that a convicted felon might be in possession of a gun at 1828 Norlil Road, but there was the affiant's statement, based upon his substantial experience, which constituted substantial evidence that weapons used in the commission of a drug offense and/or as protection devices in illegal drug trafficking, would be found at 1828 Norlil Road.

While the affidavit, on this point, could have, and should have, been more specific, "the task of a reviewing court is not to conduct a *de novo* determination of probable cause, but only to determine whether there is substantial evidence in the record supporting the judge's decision to issue the warrant." Massachusetts v. Upton, 466 U.S. 727, 728 (1984). As to the authority to search for a

25

weapon, this Court finds there was substantial evidence supporting the judge's decision to issue the search warrant, including a search for weapons.

This finding does not itself end the inquiry as to the firearm. The exclusionary rule is often in contravention to the truth and its exercise must be carefully tailored to accomplish the goal of deterring police misconduct, whether intentional or reckless. To this end, United States v. Leon modified the exclusionary rule so as not to bar from admission evidence "seized in reasonable, good-faith reliance on a search warrant that is subsequently held to be defective." 468 U.S. 897, 905 (1984). Suppression "is appropriate only if the officers were dishonest or reckless in preparing their affidavit or could not have harbored an objectively reasonable belief in the existence of probable cause." United States v. Leon, 468 U.S. 897, 926 (1984). Where an officer's reliance on a warrant is objectively reasonable, the Supreme Court held, no additional deterrent effect will be achieved through the exclusion from evidence of the fruits of that search. Id. at 922. For the reasons set forth below, the Court finds that the good faith exception does apply to these facts.

The good-faith exception to the exclusionary rule is inapposite in four situations: (1) where the issuing judge was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard for the truth; (2) where the issuing judge wholly abandoned his judicial role and failed to act in a neutral and detached fashion, serving merely as a rubber stamp for the police; (3) where the affidavit was nothing more than a bare bones affidavit that did not provide the judge with a substantial basis for determining the existence of probable cause, or where the affidavit was so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable; and (4) where the officer's reliance on the warrant was not in good faith or objectively reasonable, such as where the warrant is facially deficient. United States v. Hython, 443

26

F.3d 480 (6th Cir. 2006). First, there was no false statement made or even alleged, let alone any that would have misled the judge. Second, there is no evidence that Circuit Court Judge Vance acted as a rubber stamp. This Court has already concluded that his finding of probable cause was based on sufficient facts to constitute a substantial basis for the issuance of this search warrant. Third, this was not a bare bones, or "form" affidavit, despite the fact that it could have been stronger. Finally, there is no evidence that the officers reliance on the search warrant was not in good faith or objectively reasonable and the warrant was not facially deficient.

Even if the officers had lacked search warrant authority, the officers may have been otherwise justified in seizure of the handgun pursuant to the "plain view" doctrine of Minnesota v. Dickerson, 508 U.S. 366 (1993), *et alia*. Under the plain view doctrine of Dickerson, police officers may seize an object without a warrant if three conditions are satisfied:

First, the officers must be lawfully in the position from which they view the object. The officers in this case were in the process of executing a search warrant valid for the search of narcotic drugs. The weapon was found in a box in a closet within the house. The box was a container capable of concealing the narcotics that were the principal object of the search. Accordingly, the Court finds the officers were in a lawful position to view the weapon when they opened the box.

Secondly, the object's incriminating character must be immediately apparent. Here, the object was a loaded gun. A loaded gun inside a shoe box at the top of a closet, without more, does not have an incriminating character that is immediately apparent. However, a loaded weapon could have an incriminating character under some circumstances. After the officers encountered Robinson in the carport area outside the house, he stated he had illegal drugs, (cocaine) and thereafter the officers found scales and the marked money from the drug deals previously made. The defendant also

admitted he was a prior convicted felon (Tr. at 111), making the possession of a firearm an illegal activity. Thus the character of the gun was incriminating in general, and in particular as to Robinson.

The Court finds that, under these facts, the weapon did present an incriminating character when it was viewed by the searching officers and was subject to seizure under the plain view doctrine. Third, the officers had a lawful right of access by virtue of the search warrant.

There is an additional line of cases that hold that in execution of a search warrant, an officer may seize an item if there is probable cause of a nexus between the item and the criminal activity. United States v. Beal, 810 F.2d 574, 577 (6th Cir. 1987). Given the statements of the defendant and the items found, along with the fact that the firearm was found in the same room as the marked money, there was probable cause of a clear nexus between the loaded gun and the criminal activity of drug trafficking, as well as the criminal activity of being a felon in possession of a firearm.

The Court finds that there was probable cause to search for weapons as described in the search warrant. Further, a loaded gun is inherently dangerous and may be seized if it poses a potential danger, as it did here. United States v. Atchley, 474 F.3d 840, 850 (6th Cir. 2007).

Finally, the Court notes that, in any event, this defendant has waived standing to object to the seizure of this gun by his unequivocal denial that the gun was his. (Tr. at 111). Rawlings v. Kentucky, 448 U.S. 98, 104 (1980); United States v. Peters, 194 F.3d 692, 695-698 (6th Cir. 1999), cert. denied, 528 U.S. 1174 (2000).

## D. **Incriminating Statements Made Inside the House**

Defendant Robinson also challenges the admissibility at trial of certain incriminating statements attributed to him by law enforcement as having been obtained in violation of the United

28

States Constitution. Robinson asserts that these statements were taken in violation of the requirements of the Fifth Amendment Due Process Clause as set forth in <u>Miranda v. Arizona</u>, 384 U.S. 436 (1966), and were not voluntarily made within the meaning of the Due Process Clause of the Fourteenth Amendment.

A defendant may not be "compelled in any criminal case to be a witness against himself." U.S. Const. amend V. The Supreme Court held in <u>Miranda v. Arizona</u>, 384 U.S. 436, 478-79 (1966), that a suspect subject to custodial interrogation must first be given notice of his or her right against self-incrimination and that statements obtained during such custodial interrogation in violation of this <u>Miranda</u> rule may not be admitted for certain purposes in a criminal trial. However, the obligation to administer <u>Miranda</u> warnings to suspects only arises if there has been "such a restriction on a person's freedom as to render him in custody." <u>Oregon v. Mathiason</u>, 429 U.S. 492, 495 (1977) (per curiam).

Additionally, even when the <u>Miranda</u> warnings are administered, the government must prove that the defendant voluntarily, knowingly, and intelligently waived those <u>Miranda</u> rights before it may introduce an incriminating statement by a defendant. <u>Colorado v. Connelly</u>, 479 U.S. 157, 169-70 (1986). The government bears the burden of proving the voluntariness of the waiver by the preponderance of the evidence. <u>Id</u>. at 168.

Not all interactions between the police and citizens implicate the Fourth Amendment. A person can be questioned at any time by the police and those statements, if voluntary, can be admissible as evidence. The distinction is that when an individual's freedom of movement is constrained, as when a person is seized for Fourth Amendment purposes. Regardless whether that person is "in custody" or temporarily detained, there must be lawful justification for the restraint such

that person's freedom and the scope of the detention and what occurs during the seizure must be closely related to that justification. See Florida v. Royer, 460 U.S. 491, 500 (1983).

The Court has already found that Robinson's initial detention was reasonable and necessary to the execution of the search warrant, and authorized by Michigan v. Summers, 452 U.S. 692 (1981). Joyner testified at the hearing that as the search and investigation continued, Robinson voluntarily accepted responsibility for all items of contraband, proceeds and paraphernalia found inside the house, apparently as a result of his knowing and intelligent decision to attempt to spare his girlfriend from arrest. Given the facts adduced at the hearing, the Court finds that Robinson was under arrest at the time he was taken inside the house, as the cocaine on his person had already been obtained. Hinson testified that he advised Robinson of his Miranda rights in the carport, after other officers stood Robinson up, but before he was taken inside the house. Joyner corroborated this testimony, as did Bush. Robinson testified that no officer advised him of his Miranda rights. The Court finds the officers' testimony credible and Robinson's testimony not credible.

The question of whether a suspect was properly informed of his *Miranda* rights is a strictly factual one. Bailey v. Hamby, 744 F.2d 24, 26 (6th Cir. 1984)(citing Sumner v. Mata, 449 U.S. 815 (1980)).

In pertinent part, Hinson's testimony was:

> Q: And what did you tell him?
>
> A: Advised him that he had the right to remain silent, anything he said could be used against him in court. He had the right to counsel. He had the right to have counsel present before any questioning. That these fellas wanted to speak with him about the events that had taken place that night, and, you know, he didn't have to speak with them, if he didn't want to, without counsel present.
>
> Q: And did –

A: And understand that is not verbatim. That is, you know, I explained his right to him. I can't remember the verbatim words I used.

Q: Did you have a card or anything you were working off of?

A: No sir, I didn't. I know them by memory.

While this Court, and the Sixth Circuit, recommend the aid of a card rather than just memory, there is no requirement of a precise formula for <u>Miranda</u> warnings. <u>California v. Prysock</u>, 453 U.S. 355, 359 (1981). So long as the admonition reasonably conveys his rights to the defendant, no "talismanic incantation" is required to satisfy <u>Miranda</u>. <u>Duckworth v. Eagan</u>, 492 U.S. 195, 202-03 (1989). The Court finds Lt. Hinson's recitation reasonably conveyed to the defendant his rights and he acknowledged his understanding of them.

The Court finds that Hinson recited sufficient <u>Miranda</u> warnings to Robinson. While the officers testified that they did not present Robinson with a written <u>Miranda</u> waiver form, either because one was not available or because they thought he would not sign it, such is not required. <u>United States v. Miggins</u>, 302 F.3d 384, 391 (6th Cir. 2002), <u>cert. denied</u>, 537 U.S. 1130 (2003). Hinson testified that Robinson heard and understood the <u>Miranda</u> admonition. Contrary to defense counsel's arguments, Joyner's report did not indicate that no <u>Miranda</u> warning was given, but only that no written admonition of rights form was signed. During this testimony, Joyner again confirmed that <u>Miranda</u> warnings were given orally. The Court finds that the government has carried its burden of proof to demonstrate that Robinson gave a knowing and intelligent waiver of his right to remain silent and his right to counsel before making his incriminating responses to inquiries by the officers while inside the house. Robinson's own testimony established that he <u>volunteered</u> the

statement to Joyner, "if she [Christina Thomas] tells you where the money is at, is she going to jail?
... I said, tell him." This was consistent with the officers' testimony that Robinson knowingly made statements and admissions in a calculated attempt to exonerate his girlfriend.

### III: <u>CONCLUSION</u>

For the reasons set forth herein, it is **RECOMMENDED** that the defendant's Motion for Suppression of Arrest of Defendant and Suppression of the Search Warrant **[Doc. 15]**, along with supplemental addenda **[Doc. 18]** and **[Doc. 29]**, be **DENIED**.[9]

Respectfully submitted,

C. Clifford Shirley Jr.
United States Magistrate Judge

---

[9] Any objections to this report and recommendation must be served and filed within ten (10) days after service of a copy of this recommended disposition on the objecting party. Fed. R. Crim. P. 59(b)(2). Failure to file objections within the time specified waives the right to review by the District Court. Fed. R. Crim. P. 59(b)(2); <u>see also</u> <u>Thomas v. Arn</u>, 474 U.S. 140 (1985) (providing that failure to file objections in compliance with the ten-day time period waives the right to appeal the District Court's order). The District Court need not provide <u>de novo</u> review where objections to this report and recommendation are frivolous, conclusive, or general. <u>Mira v. Marshall</u>, 806 F.2d 636, 637 (6th Cir. 1986). Only specific objections are reserved for appellate review. <u>Smith v. Detroit Federation of Teachers</u>, 829 F.2d 1370, 1373 (6th Cir. 1987).